SENN PARK NURSING CENTER *et al.*, Plaintiffs-Appellees, *v.* JEFFREY C. MILLER, Director, Department of Public Aid, Defendant-Appellant.

First District (3rd Division)   No. 80—2714

Opinion filed September 28, 1983.

Tyrone C. Fahner, Attorney General, of Springfield (Ellen P. Brewin, Special Assistant Attorney General, of counsel), for appellant.

Richard F. Zehnle, of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiffs, three Illinois nursing home facilities, sought a writ of *mandamus* against defendant, Jeffrey C. Miller, Director of the Illinois Department of Public Aid (IDPA), directing him to reimburse plaintiffs for Medicaid services in accordance with the inflation update procedure set forth in the Illinois State Medicaid plan which was in effect prior to January 1, 1980, rather than the procedure adopted in a rule amending the plan, which was effective January 1, 1980. On cross-motions for summary judgment the court found that the amendment was invalid and ordered that, beginning with services rendered on February 15, 1980, defendant update plaintiffs' operating costs for inflation by using the method contained in the State plan in effect prior to January 1, 1980. Defendant appeals. Plaintiffs cross-appeal that portion of the order which provides that their requested method of reimbursement begin with services rendered on February 15, 1980. We affirm in part, modify in part and remand.

The State of Illinois provides nursing home care for needy individuals through Medicaid, which is a cooperative State-Federal, partially federally reimbursed program authorized under the Social Security Act (see 42 U.S.C. sec. 1396 *et seq.*). The program is implemented in accordance with Federal regulations (42 C.F.R. sec. 430 *et seq.* (1979)) and administered by IDPA. To participate in the Medicaid program, Illinois must have a State plan, approved by the Department of Health and Human Services (HHS) (42 U.S.C. sec. 1396), which provides, *inter alia*, "for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary [of HHS] ***." (42 U.S.C. sec. 1396a(a)(13)(E)).[1] In determining rates of reimbursement, IDPA must reasonably take into account economic trends such as inflation. (See 42 C.F.R. sec. 447.303 (1979).) Thus, Illinois nursing home facilities such as plaintiffs submit to IDPA annual cost reports which detail their expenses for the fiscal year preceding the calendar rate year. (See 42 C.F.R. sec. 477.274 (1979).) On the basis of these cost reports, IDPA calculates reimbursable costs and inflation updates of those costs. Prior to January 1, 1980, IDPA calculated the inflation update by comparing the two most recent cost reports of all nursing homes with the Consumer Price Index experience over the same period, and multiplying that factor by the projected price changes for the upcoming year.

On December 14, 1979, IDPA sent plaintiffs and other nursing home facilities copies of changes to the State Medicaid plan which included an amended procedure for calculating the inflation update factor whereby all available cost reports rather than the two most recent cost reports would be compared. From December 17 through December 24, IDPA published notice of the amended inflation update procedure in the newspaper of widest circulation in each Illinois city with a population of 50,000 or more. The notice did not provide for comments. The notice was not published in the Illinois Register because it was refused by that publication. On May 14, 1980, HHS approved the amendment retroactive to January 1, 1980.

On February 14, 1980, plaintiffs received their first payments

---

[1]Effective October 1, 1980, 42 U.S.C. sec. 1396a(a)(13)(E) was redesignated as sec. 1396a(a)(13)(A) and amended to require nursing home reimbursement on the basis of "rates *** which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ***."

computed in accordance with the amended inflation update procedure, and on February 15, 1980, plaintiffs demanded that IDPA pay them in accordance with the preamended method. After IDPA refused plaintiffs' demand, plaintiffs filed their complaint for *mandamus*. The court found that the amended inflation update procedure was invalid (1) because it is a rule within the meaning of the Illinois Administrative Procedure Act (IAPA) (Ill. Rev. Stat. 1979, ch. 127, par. 1001 *et seq.*), but was not published as required by that Act and (2) because it was not published as required by Federal regulations (42 C.F.R. sec. 447.205 (1979)). The court then ordered defendant to "update Plaintiffs' operating costs for inflation by using the method contained in the State plan in effect prior to January 1, 1980 commencing with services rendered on February 15, 1980, the date of Plaintiffs' demand on defendant to do so."

On appeal defendant argues that IAPA rulemaking procedures do not apply to the amendment of the State Medicaid plan, that he has not failed to comply with Federal notice and comment regulations, and that plaintiffs have not established the prerequisites for the issuance of a writ of *mandamus*.

■ The IAPA establishes notice and comment procedures for the adoption of agency rules. (Ill. Rev. Stat. 1979, ch. 127, pars. 1005 through 1005.03.) Defendant first contends that the notice and comment procedures are inapplicable here because the amended inflation update procedure, which constituted an amendment to the State Medicaid plan, is not a rule within the meaning of the IAPA. We note that although defendant frequently phrases his arguments in terms of the "state plan," it is only a rule amending the plan which is at issue here. Specifically, defendant asserts that the State Medicaid plan is a contract between the State and the Federal government which is without legal effect until it is approved by HHS. Defendant argues that since administrative rules have the force and effect of law, agency statements are not rules if their legal effect is contingent upon approval by a Federal agency. Thus, defendant maintains that "the lack of autonomy of the State Plan robs it of the essential ingredients of a rule." We believe that defendant's argument is not tenable.

Under the IAPA, a rule is defined as follows:

" 'Rule' means each agency statement of general applicability that implements, applies, interprets, or prescribes law or policy, but does not include (a) statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency,

(b) informal advisory rulings issued pursuant to Section 9, (c) intra-agency memoranda or (d) the prescription of standardized forms." (Ill. Rev. Stat. 1979, ch. 127, par. 1003.09.) The definition of a rule is very broad and it has only four specific, narrowly defined exclusions. In addition, we must construe the term liberally in order to effectuate the purposes underlying administrative procedure acts, one of which is to increase the opportunity for members of the public to have input into the formulation of agency policies which affect them. See Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, The Rulemaking Process*, 60 Iowa L. Rev. 731, 828 (1975); see also Burns, *Judicial Enforcement of the Illinois Administrative Procedure Act's Rulemaking Provisions*, 55 Chi.-Kent L. Rev. 383, 391 (1979).

Plainly, the amended inflation update procedure is an agency statement of general applicability that implements policy. Looking at the IAPA definition of a rule and its exclusions, it is obvious that the emphasis is on general applicability, not on an agency's autonomy in adopting a rule. None of the exclusions even suggests that a Federal approval requirement would have any effect on the characterization of an agency statement as a rule. Thus, we will not read an autonomy requirement into the definition for a rule.

We believe that defendant's reliance on *Wolston v. District of Columbia Department of Human Resources Social Services Administration* (D.C. App. 1972), 291 A.2d 85, is misplaced. In *Wolston*, a food stamp recipient challenged an increase in the cost of his food stamp allotment on the ground that the increase was based upon rules and regulations which had not been promulgated and published as required by the District of Columbia Administrative Procedure Act. The *Wolston* court concluded that food stamp eligibility was controlled by the regulations of the Secretary of the United States Department of Agriculture as implemented by its Food and Nutrition Service, not by District of Columbia regulations, and that the Federal regulations were not rules which the District of Columbia was required to publish. 291 A.2d 85, 87.

■ The reimbursement of nursing home facilities under Medicaid does not involve the amount of Federal control found in *Wolston*. The statute in effect at the time IDPA amended the inflation update procedure required a State plan which provided for payment "in accordance with methods and standards which shall be *developed by the State* on the basis of cost-finding methods approved and verified by the Secretary [of HHS] ***." (Emphasis added.) (42 U.S.C. sec.

1396a(a)(13)(E).) The current statute increases State control by eliminating this approval requirement. (See footnote 1.) Thus, HHS does not provide a fixed basis for the reimbursement of nursing home facilities. Rather, the States, with Federal guidance, set reimbursement rates. Moreover, even if this case involved the amount of Federal control found in *Wolston*, we believe that under the IAPA, Federal control would not be dispositive of the question of whether the amended inflation update procedure is a rule, but rather, would go to the question of whether general or peremptory rulemaking procedures are required. (See Ill. Rev. Stat. 1979, ch. 127, pars. 1005.01, 1005.03.) We conclude that the amended inflation update procedure is a rule within the meaning of the IAPA.

Defendant next argues that if the amended inflation update procedure is a rule within the meaning of the IAPA, it comes under either the public contracts or the agency management exception to which the notice and comment procedures of the IAPA do not apply. (See Ill. Rev. Stat. 1979, ch. 127, par. 1005(c).) We disagree.

■■ We first turn to defendant's contention that the amended inflation update procedure comes under the contracts exception. In defendant's initial brief, the basis of his contracts exception argument appears to be his contention that the State Medicaid plan is a contract between the Federal government and the State. In defendant's reply brief, the basis of his contracts exception argument appears to be his assertion that there are contracts between IDPA and plaintiffs in which plaintiffs agreed to accept payment pursuant to reimbursement rates as adopted or amended by IDPA. We believe, however, that the contracts here, whether State-Federal or agency-provider, do not bring the amended inflation update procedure within the contracts exception to the notice and comment procedures of the IAPA.

We note first that public participation "in the rule-making process is essential in order to permit administrative agencies to inform themselves and to afford adequate safeguards to private interests." (Bonfield, *Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts*, 118 U. Pa. L. Rev. 540, 540 (1970), quoting Final Report of the Attorney General's Committee on Administrative Procedure 102 (1941).) Nevertheless, it would be unreasonable to require notice and comment every time an agency entered into, cancelled or rescinded a contract. (See *Rainbow Valley Citrus Corp. v. Federal Crop Insurance Corp.* (9th Cir. 1974), 506 F.2d 467, 469.) Thus, we believe that the contracts exception to the IAPA notice and comment procedures represents an attempt to balance the need for public participation with the need for agency effi-

ciency. However, while the contracts exception is potentially very broad, the salutary effect of notice and comment procedures is such that courts should only reluctantly recognize the exception. (See *Humana of South Carolina, Inc. v. Califano* (D.C. Cir. 1978), 590 F.2d 1070, 1082.) It is noteworthy that the contracts exception and other exceptions in the Federal APA (5 U.S.C. sec. 553(a)(2)) have been the subject of substantial criticism, and that many Federal agencies, including HHS, have agreed to follow rulemaking procedures even if the subject matter would fall within the Federal APA's grants, benefits and contracts exceptions. See *Vigil v. Andrus* (10th Cir. 1982), 667 F.2d 931, 937.

Although we lack legislative history similar to that referred to by Federal courts in construing the exceptions to the rulemaking requirements of the Federal IAPA, Federal decisions provide guidance in this area. (See *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480, 484, 368 N.E.2d 100, 103.) We are persuaded that under the IAPA, as under the Federal APA, a matter comes under the contracts exception only when contracts are *clearly* and *directly* involved. (See *Humana of South Carolina, Inc. v. Califano* (D.C. Cir. 1978), 590 F.2d 1070, 1082.) We believe that with regard to the reimbursement of nursing homes, contracts, whether State-Federal or agency-provider, are not clearly and directly involved, but rather, are only incidental means to the end of providing nursing home care for needy individuals. (See *Vigil v. Andrus* (10th Cir. 1982), 667 F.2d 931, 936 (where the court found that a Federal free school lunch program was not within the Federal contracts exception).) Accordingly, we conclude that the amended inflation update procedure is not a matter relating to contracts within the meaning of the IAPA.

We believe that the three cases on which defendant relies are distinguishable. In *Humana,* the court did not uphold the district court's determination that an HEW regulation limiting a recoverable cost for Medicare providers could be regarded as a contract within the Federal APA exception. (*Humana of South Carolina, Inc. v. Califano* (D.C. Cir. 1978), 590 F.2d 1070.) Rather, *Humana* was decided on the basis of the benefits exception to the Federal APA, and the *Humana* court specifically stated that it did not consider the scope of the contracts exception. (590 F.2d 1070, 1083 n.98.) In *Housing Authority v. United States Housing Authority* (8th Cir. 1972), 468 F.2d 1, the relationship between the Federal and local agencies was quite different from the relationship between the State agency and the providers here. *Housing Authority* involved the Department of Housing and Urban Development's (HUD) annual contributions contract with local

512

housing authorities whereby HUD furnished a certain amount of money to local authorities over a period of years. The *Housing Authority* court specifically characterized this contract as representing a governmental proprietary interest, effectuating "the government's stewardship over public housing projects which are purchased with public funds." 468 F.2d 1, 9.

■ The third case relied on by defendant, *Department of Health & Mental Hygiene v. Lions Manor Nursing Home* (1977), 281 Md. 425, 378 A.2d 1351, was decided on the basis of the contracts between the parties, not on the basis of a contracts exception to an administrative procedure act. In *Lions Manor*, the court found that if a prior contract between the nursing home and the State agency did not provide for modification, or if it reflected an intent that modification must follow certain procedures which had not been satisfied, then the agency could not alter the terms of the contract. (378 A.2d 1351, 1354.) Here, plaintiffs agreed to receive payment pursuant to the reimbursement rates then in effect, as adopted or amended by IDPA. However, the agreement also provided that acceptance of the rates was not a waiver of the right to pursue legal or administrative remedies or negotiations for rate adjustments or increases. We believe that plaintiffs' agreement to accept payment pursuant to amended rates presupposes that any amendments would be properly promulgated under the IAPA, particularly because (1) the agreement contains the "no waiver" language, (2) the Illinois Public Aid Code incorporates the provisions of the IAPA (Ill. Rev. Stat. 1979, ch. 23, par. 12—13) and (3) the Illinois Public Aid Code specifically requires that IDPA "provide, during the process of establishing the payment rate for skilled nursing and intermediate care services, or when a substantial change in rates is proposed, an opportunity for public review and comment on the proposed rates prior to their becoming effective." (Ill. Rev. Stat. 1979, ch. 23, par. 5—5.7.) Thus, we simply cannot conclude, as defendant suggests, that the contracts between plaintiffs and IDPA operate independently of the IAPA. Accordingly, even if we were to adopt the *Lions Manor* approach, the amended inflation update procedure was plainly insufficient as promulgated here to effect a change in plaintiffs' payments.

■ Next, defendant contends that the amended inflation update procedure comes under the agency management exception which provides that notice and comment procedures to not apply to a matter relating solely to agency management (Ill. Rev. Stat. 1979, ch. 127, par. 1005(c)). We find no merit in defendant's contention. We believe that the agency management exception, like the contracts exception,

reflects an attempt to balance the need for public participation with the need for agency efficiency. Where a matter relates solely to agency management, the value of public participation may be minimal and the burden of notice and comment procedures may be unwarranted. (See *Steward v. Smith* (D.C. Cir. 1982), 673 F.2d 485, 506 (Wright, J., dissenting).) Nevertheless, that the agency management exception in the IAPA is intended to have limited scope is evident from the use of the word "solely" (see *Aguiar v. Hawaii Housing Authority* (1974), 55 Haw. 478, 488, 522 P.2d 1255, 1262), which manifests that matters which extend beyond agency management would not come under the exception.

We believe that under the IAPA, matters which relate *solely* to agency management are those which relate only to the internal affairs of the agency and do not affect private rights. (See *Walker v. Commissioner, Department of Income Maintenance* (Conn. 1982), 446 A.2d 822, 824-25.) This construction harmonizes with the IAPA definition of a rule, which specifically excludes "statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency ***." (Ill. Rev. Stat. 1979, ch. 127, par. 1003.09(a).) Thus, we conclude that a rule which has a substantial effect on persons outside the agency cannot be characterized as a matter relating solely to agency management. (See *Batterton v. Marshall* (D.C. Cir. 1980), 648 F.2d 694, 707-08.) Here, the amended inflation update procedure did not relate solely to the internal affairs of the agency, but rather, constituted a change which would substantially affect the reimbursement to plaintiffs and to other nursing homes. Plainly, the amended procedure was not merely a "technical 'internal management' change" as defendant contends. Since the amended procedure does not relate solely to agency management, the notice and comment procedures of the IAPA apply.

■ Defendant next argues that since plaintiffs received actual notice of the amended inflation update procedure approximately two weeks before the procedure became effective, plaintiffs cannot challenge the agency's failure to comply with IAPA publication requirements. We disagree.

Section 4(c) of the IAPA provides:

> "No agency rule is valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been made available for public inspection and filed with the Secretary of State ***. This provision is not applicable in favor of any person or party who has actual knowledge

thereof." (Ill. Rev. Stat. 1979, ch. 127, par. 1004(c).)

Section 4(a) involves the adoption of rules, public information and availability of rules, and it specifically provides that its requirements for the adoption of rules of practice and for the availability of rules for public inspection are "[i]n addition to other rule-making requirements imposed by law ***." (Ill. Rev. Stat. 1979, ch. 127, par. 1004(a).) It is section 5 of the IAPA which deals with rulemaking. We believe that the rulemaking requirements of section 5 are separate and distinct from the "available for public inspection" requirement of section 4. We therefore conclude that the actual knowledge provision of section 4 applies only to the "available for public inspection" requirement and not to the rulemaking requirements of section 5. If we were to find actual knowledge sufficient to preclude a challenge to an agency's failure to comply with rulemaking requirements, we would effectively do away with the public's opportunity to comment and the agency's duty to consider comments. Thus, we conclude that despite actual knowledge, plaintiffs may challenge IDPA's failure to comply with the IAPA rulemaking requirements in amending the inflation update procedure.

Having rejected defendant's arguments regarding the IAPA, we conclude that the court properly found that the amended inflation update procedure is a rule within the meaning of the IAPA. Defendant does not contend that he followed IAPA rulemaking procedures, and we believe that the court properly found that the amended inflation update procedure was not published as required under the IAPA.

■ The court further found that the amended inflation update procedure was invalid because it was not published as required by Federal regulations (42 C.F.R. sec. 447.205 (1979)), which provide that the agency must give "public notice of any proposed change in the Statewide method or level of reimbursement for a service, if the change is expected to increase or decrease Medicaid payments for that service by 1 percent or more during the 12 months following the effective date of the change." Defendant maintains that plaintiffs do not have a private right of action to compel State compliance with the conditions of the Social Security Act or the regulations promulgated thereunder. However, in this *mandamus* action, plaintiffs do not seek to compel defendant to publish the amended inflation update procedure as required by Federal regulations. Rather, plaintiffs seek to compel defendant to reimburse them in accordance with the previous inflation update procedure, and plaintiffs can establish that this is defendant's legal duty only by demonstrating that the amended procedure is invalid. We therefore believe that defendant's argument is in-

apposite.

Alternatively, defendant contends that he did not violate Federal notice and comment regulations. We disagree. First, we note that the Federal notice and comment regulations which were in effect when defendant attempted to change the inflation update procedure have been amended to eliminate the 1% expenditure threshold, and they now require the agency to provide "public notice of any significant proposed change in its methods and standards for setting payment rates for inpatient hospital services and long-term care facility services." (42 C.F.R. sec. 447.254(a) (1982).) We believe that even if we were to apply the current regulations (see *Seniors United for Action v. Ray* (8th Cir. 1982), 675 F.2d 186), public notice is still required since plaintiffs provide long-term care facility services within the meaning of the regulations (see 42 C.F.R. sec. 447.251 (1982)), and the amended inflation update procedure is a significant change in the method for setting payment rates. However, the amended notice and comment regulations eliminated the 60-day prior notice requirement and merely require publication of notice before the proposed effective date of the change. (42 C.F.R. sec. 447.254(d)(1) (1982).) Thus, if current regulations apply, defendant did not fail to comply with the publication requirements. However, both the current regulations and the regulations in effect in December 1979 also specify the proper content of the notice, including the requirement that the notice "[g]ive an address where written comments may be sent and reviewed by the public ***." Since the notice which defendant published contained no reference to comments, we believe that regardless of whether we apply the regulations in effect now or in December 1979, defendant failed to comply with the requirements. Therefore, we conclude that the court properly found the amended inflation update procedure invalid on the basis of defendant's failure to comply with Federal notice and comment regulations.

■ Next, we turn to the question of relief. Plaintiffs sought a writ of *mandamus* directing defendant to reimburse them according to the inflation update procedure in effect prior to January 1, 1980. The court ordered the requested reimbursement beginning with services rendered on February 15, 1980. Plaintiffs contend that since the amended inflation update procedure was never valid, they are also entitled to the requested relief for services rendered between January 1 and February 15. Defendant maintains that plaintiffs have not established a clear and undoubted right to *mandamus*, that confusion or disorder will result from the reimbursement, that an award of such "money damages" is inappropriate here and that if reimbursement is

appropriate, the court properly found that it should not begin until the date of plaintiffs' demand on defendant.

We believe that plaintiffs correctly assert that it is the date on which plaintiffs have a clear legal right to relief rather than the date of plaintiffs' demand on defendant which determines the extent of relief in this case (*cf. Chriswell v. Rosewell* (1979), 70 Ill. App. 3d 320, 324, 388 N.E.2d 175, 178), particularly since a demand is unnecessary where, as here, the duty to act is of a public nature (see *People ex rel. Busch v. Green* (1917), 281 Ill. 52, 58, 117 N.E. 764, 766). Thus, we conclude that plaintiffs are entitled to relief beginning with services rendered on January 1, 1980.

■ A writ of *mandamus* is extraordinary relief which is issued in the discretion of the court according to what seems necessary and proper to achieve a just result. (See *People ex rel. Pletcher v. Dolan* (1943), 317 Ill. App. 496, 500, 47 N.E.2d 124, 126.) Here, as Medicaid providers, plaintiffs have a clear legal right to reimbursement in accordance with valid rules. Defendant has a corresponding duty to promulgate valid rules and to reimburse plaintiffs in accordance therewith. In amending the inflation update procedure, defendant failed to comply with the IAPA and the Federal notice and comment regulations. As a result, the amended inflation update procedure was an invalid rule. Therefore, plaintiffs have a clear and undoubted right to reimbursement according to the inflation update procedure in effect prior to January 1, 1980. We are not persuaded that, as defendant suggests, such confusion and disorder would result from the reimbursement as to require a denial of the writ of *mandamus*.[2]

Accordingly, the judgment of the circuit court of Cook County is affirmed in part and modified in part and the case is remanded for further proceedings consistent with this opinion.

Affirmed in part, modified in part and remanded.

McNAMARA, P.J., and WHITE, J., concur.

---

[2]Defendant estimates that the additional cost to the State for the reimbursement is $4,800,000. The source of defendant's estimate is the affidavit of an employee of the Office of Health Finance, Illinois Department of Public Health. In this regard, defendant has stated that payments to nursing homes during 1980 computed in accordance with the preamended inflation update procedure would have exceeded 1979 payments by 15%. Plaintiffs maintain that $4,800,000 is the maximum potential cost if payments are made in accordance with the preamended inflation update procedure for the entire year (1979) to all nursing homes in Illinois.